Mr. Honick, good morning. Good morning. May it please the court, I am Reuben Honick and I have the privilege of representing the plaintiff appellants in this case together with Michael Bogdanoff. With the court's permission, I'd like to reserve five minutes for rebuttal. Five minutes? Yes, your honor. Your honors, Claire Ballant, one of the plaintiff's appellants in this case, had a positive beryllium lymphocyte proliferation test in March of 2005. And that's a highly significant finding in this case for a number of reasons. It demonstrates and means that as a result of her exposure to beryllium, and only because of her exposure to beryllium, her cells had a positive proliferative response which confirms that she is reactive to beryllium. I thought that the medical testimony was that there was no significance to the BLT test except when there were two positives. That's not exactly correct, your honor. The significance of two positive BELPTs is that it confirms a diagnosis of beryllium sensitization. And is the beginning of subcellular changes? Well, that's not correct. That's actually a physiological change, which is to say that the allergic reaction, the immunological reaction But the fact of the matter is that she never had two positives. That is absolutely correct. She had one positive and a series of negatives. That's correct. And so beryllium medicine and beryllium science is rather unique. There is not a clear linear dose response relationship as there is with many other toxins. And so the concept here is that when the Massachusetts SJC created this new remedy, which is a deviation from traditional tort law that says show me an actual present injury, it recognized that something short of or before reaching an actual injury is compensable. Now let me pause and say that the compensation that we seek and the one that was sought and And so the question in the context of beryllium medicine is at what point before the beryllium sensitization is detected by two positive LPTs, is there a cellular or subcellular or subclinical process taking place which can be recognized? So is there anything in the record to show that one positive joint has developed into the disease itself? No. In fact it's not the disease itself. It's a precursor condition to the disease which tells the physician that you have to continue to monitor that person. Because of the unusually long latency period for chronic beryllium disease, it can take 40 years to materialize. And there can be literally years or decades in between a positive and a negative. It tells the physician that you have to keep looking. What's the state of the medical evidence in the record as to the significance of one positive BLT? That's really the question I wanted to ask. The record is silent on it. And who has the burden of proof? The burden of proof is clearly ours to demonstrate that there is a So how can one positive test on one person help you in the face of a silent record? Because the record does reveal that every person exposed to beryllium above background is susceptible from an epidemiological standpoint to a cellular process. I understand that. And I think Judge Wolf understood that. But that's precisely the question that the Donovan Court in the SJC left for another day. And the question that the Donovan Court at least did not preserve. Well, there are two statements that you've made, Judge. One that I vehemently disagree with about waiver. And I'll get back to why there was no waiver. You disagree with my statement that Judge Wolf held that? No. No. He clearly held it. And with a sign of error. And the basis for Judge Wolf's finding, frankly, is the theory of the pleadings, which is something  Without the theory of the pleadings, in fairness, Judge Wolf based his holding principally on two things. One was the fact that he specifically told counsel, or asked counsel, if this left for another day question, that did they want him to certify that to the SJC, and everyone said no. He then, he based it partially on that, which he took to mean that this case didn't raise that question. He then based it on what was said to him when he held the status conference for the express purpose of narrowing and clarifying the issues before he entertained argument on summary judgment. And I've read, and I'm sure my colleagues have read, the transcript of that status conference. And my initial impression, my impression as I sit here today, is that that, is that it's a fair interpretation of what was said at the status conference, taking the dialogue as a whole, that that question was not, call it what you want, waived, not preserved, either way, and the focus was, are there, is there sufficient proof here of subcellular change? Your Honor, I think you have absolutely fairly characterized what was in Judge Wolf's mind. I don't think that's the question specifically before the panel. There's no question but that we believe then, and we believe today, that we fit squarely within the requirements of Donovan, and that our expert testimony satisfies the so-called subcellular requirement. We said as much in the status conference, but we explained to the Court, and I think a fair reading would reveal this as well, that we wanted to show the nuance to that question, and that is to say that beryllium science and medicine is not the same as the science and medicine of smoking and cancer. And so the Donovan Court, I think the question is a philosophical one, and that is, should Donovan be read in the literal sense, in the narrowest sense of subcellular requirement, or can we take a step back, and is the case susceptible to being read as inviting future courts to determine whether this toxin looks like smoking or if it's different? And what we argued to the Court in our moving papers was vehemently that we do meet the requirement, but in the event that we don't, the Court is not only not precluded from deciding whether this is the other day case, but that it was obliged to. And so if beryllium, in the view of Judge Wolf, was not like smoking and cancer, it really respectfully created an obligation on the part of the district court to answer the question that was left unanswered. It's okay for us to advocate that we fit within it and in the alternative argue that the Court should therefore look at it. And so I started my oral presentation today by focusing on the one LPT. Let me follow up with what you've said. What you're saying, in effect, is that Judge Wolf's position of the parties were, as represented to him at the status conference, was wrong because he overlooked that the plaintiffs were also preserving this alternative argument. That's the sum and substance of what you just said. I think that's largely correct. And with due disrespect... But before you go beyond that, when we look at Judge Wolf's decision to that effect, what is our standard of review? Well, in the context of summary judgment, it's de novo. No, no, no. The ultimate issue on summary judgment is that determination is de novo. But that doesn't mean preliminary issues along the way are de novo. If a district court decides to exclude expert testimony and won't consider it on summary judgment, we review that determination for abuse of discretion. And so on this preliminary decision as to whether the parties have or have not, whether the plaintiffs have or have not, abandoned a particular issue, what's our standard of review on that determination? That's not summary judgment. That's an ancillary and preliminary decision. I don't think the standards are severable. And the reason for that is because all of the parties were put out of court under Rule 56. And so the question, I think, respectfully is subsumed within a de novo review. So then our cases that say the decision on excluding expert evidence preliminary to a Rule 56 determination is reviewed for abuse of discretion are wrong? I don't think that this is analogous, Judge Selya, to the refusal to consider expert testimony or other evidence. This is a ruling that the court made on a belief that the pleadings – I mean, this is what the opinion actually says – that the pleading narrowly circumscribed what we preserved. And that is an incorrect finding as a matter of law. And I'll come back to it in my five minutes, but I think that's the standard. Have we waived it in our pleading? And the answer is no. Thank you. Mr. Albano, good morning. Good morning. May it please the Court, my name is John Albano. With me is my partner, Janice Howe, and our co-counsel, Ronald Jacobs. Could I ask you to start where I left off with the plaintiff's counsel? On Judge Wolf's characterization of what occurred at the Status Conference and the intermediate conclusions that he drew from that, which obviously shaped his determinations at summary judgment. What's our standard of review in reviewing that determination? It's abuse of discretion because, at a bare minimum, the judge was exercising his case that he undertook. He's the first one that raised the issue of whether a question should be certified to the SJC about whether there was this other, as yet unrecognized, claim under Massachusetts law in play in this case. He was told no by both parties. He then has a scheduling conference requested by the parties to talk about summary judgment. And he repeatedly says during that Status Conference, I want to let you know what the Court's current thinking is about the pending summary judgment motion. I do not read your complaints as raising the issue that the SJC left for another day, and I do not intend to address that issue in my  What we heard from plaintiff's counsel was that that was an eminently reasonable way to proceed, a very fair and efficient way to proceed, and legally correct. And so he moved forward, exercising his case management powers on that basis. There is more, though, to this story because, besides the fact that, again, this claim doesn't yet exist, the District of Columbia has not yet filed these complaints. Months after Dunn and Moon has decided, these complaints are filed, and each of them explicitly allege that, as a result of exposure to beryllium, the plaintiffs, that that exposure produced subcellular changes that substantially increased the risk of serious disease, illness, or injury. That was in their complaint, and at the summary judgment hearing, after the scheduling conference, plaintiff's counsel articulated, in a way in which we wholeheartedly agree, what is the nature of this claim that the Supreme Judicial Court left for another day? And what plaintiff's counsel said, we were in agreement then and we still agree with this, that I think that save for another day case judge is the massive radiation exposure case where you're not going to see a tumor, and you can't test it for many years. This claim, even if... That's further than you really have to go, because it may very well be this case where the expert testimony seems to be that there is an increased risk of beryllium poisoning for everyone who's been exposed to it. I'm not prepared to say that that's not a cause of action under the left for another day prong. And do you really have to enter into that argument? No, you are correct, Your Honor. I do not have to, but it does underscore the point that if one is speculating about what this claim might be, which does not now exist under Massachusetts law, then it does seem to be a kind of Three Mile Island, Chernobyl type scenario that the SJC did not recognize as a claim that could be pressed without proof of subcellular changes, but left it for another day. So yes, it's... And finally, I would say this on this point. This Court has on several occasions talked about how a federal district court is supposed to handle a case involving state law claims when a plaintiff chooses to bring those state law claims in a federal court. And what this Court has said is that the district court judges are supposed to take state law as it finds it, not as it might conceivably be someday, nor even as it should be. And that is why what Judge Wolf did in this case. There is, if I may, there is potential confusion about what the holding of the Donovan case is. And I would submit that the holding is inescapably that. One of the seven necessary elements of a medical monitoring claim is that the plaintiff must present competent medical evidence that the exposure caused subcellular changes that substantially increased the risk of serious disease, illness, or injury. That was the way in which the Supreme Judicial Court addressed the traditional tort requirement that there be some type of legal injury in order for there to be a viable tort claim. And if I may, there's a very brief passage, if I may read it from Donovan. No particular level or quantification of increase in risk of harm is necessary so long as it is substantial and so long as there has been at least a corresponding subcellular change. I didn't understand that. Pardon me? I didn't understand that language. There's no degree unless it's substantial. That's a degree. It's got to be substantial. What does that mean? I don't believe critical to this, the failing of the plaintiff's case here. That you're balancing that what the SJC is doing is presented with a case where the plaintiffs say they were all exposed to beryllium at some point prior to the plant closed in 1996. So they were exposed, their complaints say, at some point prior to that closing date. They do not yet have chronic beryllium disease. They allege they have these... I think I understand what you're saying. Correct me if I'm wrong, the state tort requires subcellular change. Correct. And not just any subcellular change, but one that substantially increases the risk, not of just anything, but of a serious illness or injury, right? And in this record... That's not here. You articulated it. You articulated it better than I did. That is correct. That is the legal standard. I'm just repeating the elements. What we have here is Dr. Newman's testimony. The plaintiffs say it's one of the world's most renowned beryllium experts. And in his deposition... I understand, but I don't want to have you use your time up for something like that for me. But the language you just read trouble me, because that seemed to imply that, well, you could have a minor kind of a quantification of a risk, and that might do it. Well, I think not, Your Honor, because we're not saying it's got to be 82 or 88 percent. They say no particular level or quantification... No particular level or quantification, 0.2 percent. Right. You don't have to do that. So long as it is substantial, and so long as there has been at least a corresponding subcellular change. Right. So I don't read it as backing away... Still have to have subcellular change. Absolutely have to have subcellular change, and it makes it clear that the harm that that subcellular change produces... Right. The risk of serious disease must be serious. And here Dr. Newman could not state to a reasonable degree of medical certainty that any plaintiff or any member of the putative plaintiff class had these subcellular changes. Judge Wolf could have stopped there and entered judgment. He went further and considered Dr. Newman said he did have a way. One can prove subcellular changes in a beryllium exposure case, and Dr. Newman, plaintiff's expert, not Raytheon's, explained how. You need those two abnormal BELPT test results. No plaintiff had those two abnormal test results. It's not a case in which it is impossible to prove that beryllium causes this type of subcellular changes. It's a case in which no plaintiff had subcellular changes, and that we know from the plaintiff's expert, not from Raytheon's experts. So that is all that is needed to affirm the district court's judgment. The only reason for me to go further, if I may, is to address the arguments that the plaintiff makes that they really should not need to have to prove subcellular changes. And they make, by my count, I think three. One is that somehow Judge Gertner's certification decision in the Dunnevin case that followed the SJC's state law decision relieved them of the obligation to demonstrate some, I think their term is presently demonstrable, subcellular change. That's not so. First of all, it's beyond the power of the district court. I don't think you have to dwell on that. I think we realize that she was confronted with testimony that said all 20 year, 20 pack per year, 20 year smokers will have these changes. It's a different case. Yes, Your Honor. And in fact, if I go back to Dr. Newman on this point, a related point which counsel raised, Dr. Newman's testimony was it's well known in the literature that within a population of persons exposed, some number will have cellular changes. And then he said somewhere between 1 in 100 and 1 in 5 is going to have subcellular changes. That's clearly not a situation in which exposure necessarily causes subcellular changes. There's an additional argument that the plaintiffs should be entitled to medical monitoring to determine when and if they ever will have these demonstrable subcellular changes. I think the problem there is that it kind of leapfrogs over the necessary element of the tort. You must prove subcellular changes, among other things, in order to recover on a medical monitoring claim. And the idea that you would order a defendant to pay for the medical monitoring claim, and then the fact that subcellular changes have occurred, flips the tort on its head. There is a related important point there. Subcellular changes, beryllium sensitization. Dr. Newman, rather, teaches us that beryllium sensitization is not a disease. You do not treat it. What Dr. Newman said is that if you have BLPTs, then you're sensitized, and then you should be offered clinical evaluation to determine if one has CBD. That's the key to the medical monitoring entranceway. One or even two abnormal tests is not, according to Dr. Newman, disease. But you do need those two tests in order to recover on the claim. The last thing I'd say is I do think the record will reflect that Judge Wolf was extremely careful in trying to manage this case to a summary judgment decision. The April 26 scheduling conference demonstrates that. His whole approach to the case recognized that the SJC had spoken on this issue, which is a pure issue of state law that involves balancing competing interests. What he did throughout the case was try and follow, not expand on, but try and follow, as best one can, the parameters of the tort that the highest court of the state established. And so if I could close, this court has said in a similar context that if a plaintiff chooses to litigate a state action in a federal court, they are in a perilously poor position to grumble when the federal court follows existing state court precedent. And that, we submit, is exactly what Judge Wolf did here and why we ask that the judgment be affirmed. Thank you. Thank you. Members of the court, there's a reason that in the United States of America there's not a single monitoring regimen that uses low density CT to look for lung cancers. The first time that was ever proposed was in the smoking case that was certified. Compare that to the past 30 plus years, the United States government in the form of the DOE, the DOD, and the entirety of private industry has screened and is screening both workers, secretaries, janitors, and anybody who comes within earshot of it. So the suggestion that the element of Donovan, which required proof of impact, that's what the subcellular requirement is about. It's having the plaintiffs demonstrate either through epidemiology, through an x-ray, or otherwise, that there isn't too attenuated a relationship to the toxin. We have done that here. And what the court below unfortunately did, not out of bad faith, I should say, because the judge did lavish a lot of attention to this very important case of first impression, is that he tried to take the smoking round peg and put it into a square hole, and you can't do that. The decision that the judge made, which infected his entire analysis, and we think is a basis for finding error, was deciding that no beryllium exposed person, short of two positive BELPTs, can ever have monitoring. And I heard counsel even today repeat the same scientific misstatement. When a plaintiff has two positive LPTs, he is already diseased. It may be true that at that moment there's no active treatment for it, but that's considered pathology. And so any individual who has two positive LPTs is not a candidate for monitoring, because it's already too late. Dr. Breshears You know, this is just an excerpt, but what Dr. Dibbitt said was that BELPT confirms whether a person demonstrates a pathologically abnormal immune response, which is the hallmark immune response that is the precursor to the  Judge McAuliffe I agree. The chronic indolence, Judge McAuliffe, you've hit it on the head. The continuum for this disease is unlike any other, and the more we try to understand it through the rubric of cancer or any other linear dose response relationship, the more we're not going to be able to give effect to what the SJC wanted to do in dialing it. Dr. Breshears Where would you draw the line? If I can show someone was exposed to beryllium, then they're entitled to monitor? Dr. Dibbitt Here's where I draw the line. This is what I argue to Judge Wolf. Dr. Breshears You would draw it there, I assume. Dr. Dibbitt This is what I argue to Judge Wolf. Dr. Breshears Would you draw it there? Dr. Dibbitt I'm sorry? Dr. Breshears Would you draw the line there? Dr. Dibbitt I'm sorry, where? Dr. Breshears If I can show a person has been exposed to beryllium, they are entitled to monitoring. Dr. Dibbitt No. You have to show that you've been exposed above background, because there's a background level, and you have to produce, as we did here, epidemiological evidence of why that's increased your risk. So in the smoking case, no one member... Dr. Breshears Just for my benefit, since I have to understand it, where would you put that in the state, the SJC's articulation of its standard for a cause of action?  The answer is, I would put it at the point where a world-renowned expert comes in and says 20% of every exposed cohort that's been exposed above background is going to demonstrate not only a subcellular response before they get to two LPTs, but actually has a physiological response. And so the line has to be before you get to two LPTs. And therefore, from an epidemiological standpoint, it's no different than the smoking class. Here's why. Dr. Dibbitt But isn't that precisely the question that the Donovan Court left for another day? The question of increased risk without subclinical or subcellular changes? Dr. Breshears I will agree with you that that is one interpretation. We have advanced the position that we have fallen within the subcellularity. Remember, the word is not cellular. It's subcellular and subclinical. So before you get to be... Dr. Dibbitt But if all you need is to show that 20% of the people who are exposed at this level are likely to contract the disease or are likely to eventually show some symptoms of the disease, it seems to me to render virtually moot the need that the SJC saw to leave the Donovan question for another day. Dr. Breshears I understand, but I don't think that's the some proof of impact. And that can be bridged by appropriate epidemiological evidence as was present here, offered by Dr. Newman, that fully 20% of an exposed cohort is going to go on to this disease continuum. And in the face of that, it meets the requirement of Donovan by assuring an impact that's not too attenuated. Thank you. Dr. Dibbitt Thank you, counsel.